UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 08-00359 SJO |
| Plaintiff, | ) ) ) | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |
| v. | ) | [Docket No. 20] |
| LAWRENCE JOSEPH CARRILLO, | ) ) ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant Lawrence Joseph Carrillo's ("Carrillo") Motion to Suppress Evidence, filed September 29, 2008. Plaintiff United States of America ("the Government") has filed an Opposition, to which Defendant replied. The Court heard argument from both parties at a hearing held on October 20, 2008 and October 28, 2008. For the following reasons, Defendant's Motion is DENIED.

I.   BACKGROUND

On July 24, 2007[1] at approximately 10 p.m., Officer Rafael Vega of the South Gate Crime Impact Team was on routine patrol in the area around the Gateway Motel located at 8911 Atlantic

---

[1] In both Carrillo's and Rodriguez's declaration, the date is incorrectly listed as July 25, 2007 based on an error in the police report. (*See* Def.'s Reply to Government's Opp'n to Def.'s Mot. to Suppress Evidence ("Def.'s Reply") 3 n.1; Police Report 1; Carrillo Decl. ¶ 2; Rodriguez Decl. ¶ 2.)

Boulevard, in South Gate, California. (*See* City of South Gate Police Department, Police Report, Defendant Lawrence Joseph Carrillo; Perla Leticia Rodriguez 1 (Sept. 26, 2007) ("Police Report")); Vega Decl. ¶¶ 2–3.)  Officer Vega knew, from previous arrests, that the Gateway Motel was an active drug trafficking location. (Police Report 1; Vega Decl. ¶ 3.)  While in the vicinity of the motel, Officer Vega observed a vehicle enter the motel parking lot and park next to a black Chevy Tahoe. (Police Report 1; Vega Decl. ¶ 4.)  Officer Vega watched the driver exit the vehicle, walk to Room 127, engage in "what appeared to be a hand-to-hand drug transaction" with "an unidentified subject in the motel room," return to the vehicle, and exit the parking lot. (Police Report 1; Vega Decl. ¶ 4.)

After Officer Vega called for backup, a number of officers arrived, including Detective Tony Mendez, Detective Heriberto Gutierrez, Officer Richard Oviedo, and Task Force Officer Larry Boksa. (Vega Decl. ¶ 5; *see* Oct. 28, 2008 Tr. 34–49.)  Because Detective Mendez had an unmarked police vehicle, he parked in the motel parking lot to conduct surveillance. (Mendez Decl. ¶ 4; Vega Decl. ¶ 5.)  A short time later, Detective Mendez saw a man enter the motel parking lot in a vehicle, park outside of Room 127, exit the vehicle, knock on the door of Room 127, engage in a "hand-to-hand exchange [with] an unidentified person inside of Room 127," return to his vehicle, and exit the parking lot. (Police Report 1; Mendez Decl. ¶ 4.)

Upon noticing the Black Chevy Tahoe parked in the motel parking lot outside of Room 127, Detective Mendez called the South Gate police station and asked them to perform a "want and warrants check" on the vehicle. (Police Report 1; Mendez Decl. ¶ 5.)  He was informed that the vehicle was registered to Defendant Lawrence Joseph Carrillo and Perla Leticia Rodriguez ("Rodriguez"). (Oct. 20, 2008 Tr. 25:17–24; 34:3–17; Mendez Decl. ¶ 5.)  Additionally, Detective Mendez asked the station to run Carrillo's name through the California criminal database, after which he was told that Carrillo was on parole for drug sales. (Police Report 2; Mendez Decl. ¶ 5.)  He recognized Carrillo's name from previous encounters in the South Gate community and knew that Carrillo was a member of the Elm Street Watts gang. (Mendez Decl. ¶ 5.)

Detective Mendez then went to the motel office and spoke with a motel employee who told him that Room 127 was registered to Perla Rodriguez. (Mendez Decl. ¶ 5.) After a woman exited the room and entered the motel parking lot, Detective Mendez and Officer Vega approached the woman and spoke with her. (Mendez Decl. ¶ 6; Vega Decl. ¶ 6.) She identified herself as Perla Leticia Rodriguez, stated that she registered Room 127 in her name, was staying in the room with her boyfriend, Lawrence Carrillo, and their 20-month-old daughter, and confirmed both that Carrillo was on parole and a member of the Elm Street Watts gang. (Police Report 2; Mendez Decl. ¶ 6; Vega Decl. ¶ 6.) Detective Mendez asked Rodriguez for permission to enter the motel room to check on the safety of her daughter, to which she consented.[2] (Oct. 20, 2008 Tr. 59:15–60:1; 73:16–74:5; 89:7–15; Police Report 2; Mendez Decl. ¶ 6; Vega Decl. ¶ 6.) The officers did not place Rodriguez in handcuffs or any other physical restraint at any point during this conversation.[3] (Oct. 20, 2008 Tr. 73:20–74:5; 86:14–87:17; Oct. 28, 2008 Tr. 7:9–8:11; Mendez Decl. ¶ 6; Oviedo Decl. ¶ 4; Vega Decl. ¶ 6.)

While Detective Gutierrez remained with Rodriguez, Officer Vega and Detective Mendez approached Room 127 and found the door ajar. (Mendez Decl. ¶ 6; Oviedo Decl. ¶ 5; Vega Decl. ¶ 7; *see* Police Report 2.) From outside of the room, the officers, who had their weapons drawn, made eye contact with Carrillo, who was lying on the motel room bed alongside his daughter. (Police Report 2; Mendez Decl. ¶ 6; Vega Decl. ¶ 7.) Officer Vega asked Carrillo to identify

---

[2] In her declaration, Rodriguez claims that police did not ask for her consent "prior to entering the room" and she did not provide any such consent. (Rodriguez Decl. ¶ 3.) Rodriguez, however, did not testify at the hearing on this Motion to Suppress. The Court finds the officers' description of their request for consent to enter the motel room, as stated in the declarations of Officer Vega and Detective Mendez and repeated in their testimony at the Motion to Suppress hearing, to be credible and, thus, finds that the officers requested and Rodriguez gave the officers permission to enter the motel room to check on the well-being of her child . (*See* Oct. 20, 2008 Tr. 59:15–60:1; 73:16–74:5; 89:7–15; Police Report 2; Mendez Decl. ¶ 6; Vega Decl. ¶ 6.)

[3] In her declaration, Rodriguez states that the officers surrounded her and handcuffed her. (Rodriguez Decl. ¶ 3.) However, the Court again finds the description of the events in the declarations of Officer Vega, Detective Mendez, and Officer Oviedo, which was repeated in the testimony of Detective Mendez and Officer Vega at the Motion to Suppress hearing, to be credible and, thus, finds that the officers did not handcuff or otherwise detain Rodriguez prior to seeking consent. (See Oct. 20, 2008 Tr. 73:20–74:5; 86:14–87:17; Oct. 28, 2008 Tr. 7:9–8:11; Mendez Decl. ¶ 6; Oviedo Decl. ¶ 4; Vega Decl. ¶ 6.)

3

1  himself and he confirmed that he was Lawrence Carrillo and that he was on parole. (Police Report
2  2; Oviedo Decl. ¶ 6; Vega Decl. ¶ 7.)  After Officer Vega asked Carrillo whether he had any
3  weapons or drugs, Carrillo replied that he had a gun and drugs and pointed toward the table in the
4  corner of the room.  (Police Report 2; Mendez Decl. ¶ 7; Vega Decl. ¶ 7.)  Officer Vega and
5  Detective Mendez, who were still standing outside of the motel room, noticed an unzippered
6  backpack sitting on a chair next to the table. (Oct. 20, 2008 Tr. 67:24–68:1; 73:8–15; 76:13–77:2;
7  Oct. 28, 2008 Tr. 8:18–9:7; Vega Decl. ¶ 7; Police Report 2–3.)   Both officers observed a clear
8  bag, containing a green substance that they suspected to be marijuana, protruding from the
9  backpack. (Oct. 20, 2008 Tr. 67:24–68:1; 73:8–15; 76:13–77:2; Vega Decl. ¶ 7; Police Report
10 2–3.) Detective Mendez observed another bag of a leafy green substance that he believed to be
11 marijuana on top of the air conditioner. (Oct. 20, 2008 Tr. 42:15–43:10; 67:11–68:4; 72:20–73:8;
12 *see* Mendez Decl. ¶ 7.)

13    Upon viewing the bag of what appeared to be marijuana, Officer Vega instructed Carrillo
14 to place his hands up and walk backwards towards the two officers.  (Vega Decl. ¶ 8.)  After
15 Carrillo exited the room, Officer Vega handcuffed the defendant and performed a pat down search.
16 (Vega Decl. ¶ 8; *see* Oviedo Decl. ¶ 2.)  Carrillo then admitted that he had been selling drugs from
17 the motel room and that the handgun in his backpack was loaded.  (Vega Decl. ¶ 8.)

18    The officers entered the motel room to perform a protective sweep in order to confirm that
19 there were no other individuals present.  (Vega Decl. ¶ 8; *see* Oviedo Decl. ¶ 6.)
20 Detective Gutierrez then began a search of the backpack on the table. (Vega Decl. ¶ 8; *see*
21 Oviedo Decl. ¶ 6.)  In the search of the bag, Detective Gutierrez discovered nine Ziploc bags of
22 marijuana, fourteen Ziploc bags of methamphetamine, two Ziploc bags of cocaine, two improvised
23 containers, packaging material, a scale, several pay and owe sheets, a loaded .22 caliber
24 Jennings semi-automatic pistol that contained six live ammunition rounds, and twenty-nine
25 additional live ammunition rounds.  (Police Report 3–4.)  The police also recovered the bag of
26 marijuana on top of the air conditioner and almost $2,000 in U.S. currency that was in the dresser
27 drawer, which was open, and on top of the table. (Police Report 3, 5; Government Exs. 11–13.)
28

4

     While Carrillo was outside the motel room in handcuffs, Detective Mendez spoke with Carrillo who confirmed that the black Chevy Tahoe in the parking lot was his and consented to a search of the vehicle. (Police Report 4; Mendez Decl. ¶ 8; Oviedo Decl. ¶ 8; Vega Decl. ¶ 9.) Carrillo stated that he had two unloaded guns in the vehicle. (Mendez Decl. ¶ 8; Vega Decl. ¶ 9.) In the search of the vehicle, Officer Oviedo recovered two unloaded firearms in the backseat: a Mossberg 12-gage sawed-off shotgun and a Norinco SKS 9mm assault rifle. (Police Report 4–5; Mendez Decl. ¶ 8; Oviedo Decl. ¶ 9; Vega Decl. ¶ 9.)

     After a representative of the Department of Children and Family Services arrived to take custody of the child, the officers handcuffed Rodriguez and arrested both Carrillo and Rodriguez. (Oviedo Decl. ¶ 8; *see* Mendez Decl. ¶ 9; Vega Decl. ¶ 9.) The officers then transported Carrillo to the South Gate Jail where Officer Vega read Carrillo his *Miranda* warnings. (Police Report 6; Vega Decl. ¶ 10.) Carrillo stated that he understood his rights and signed the South Gate Police Department *Miranda* card. (Police Report 6; Vega Decl. ¶ 10.) During Officer Vega's subsequent interview of Carrillo, he admitted to being a member of the Elm Street Watts gang, to selling drugs, to having been inside Room 127, that the guns and drugs inside Room 127 and the Chevy Tahoe were his, and that he knew he was on parole for drug sales and, therefore, was not allowed to possess guns. (Police Report 6–7; Vega Decl. ¶ 10.)

     Carrillo is charged in a five count indictment with: (1) possession with intent to distribute methamphetamine, (2) possession with intent to distribute cocaine, (3) possession with intent to distribute marijuana, (4) possession of a firearm in furtherance of a drug trafficking crime, and (5) felon in possession of firearms and ammunition. Indictment, *United States v. Carrillo*, No. CR 08-00359 (C.D. Cal. 2008). Carrillo moved to suppress all of the evidence obtained during the search of his motel room and car, as well as all of his statements made to law enforcement officers. (Notice of Mot. 2.)

II.    <u>DISCUSSION</u>

     Carrillo's Motion to Suppress argues that his Fourth Amendment rights were violated because the police did not have a warrant to search the motel room and there is no applicable warrant exception, as neither Carrillo nor his girlfriend, Rodriguez, gave the officers consent to

enter and search the room. (Mot. to Suppress Evidence 6; Notice of Mot. 2; Carrillo Decl. ¶ 2; Rodriguez Decl. ¶ 3.) As to the search of his Chevy Tahoe, Carrillo claims that even if he gave the officers consent to search the vehicle, because the officers did not obtain consent from Rodriguez, the other registered owner of the vehicle, any consent to search the vehicle was invalid. (Def.'s Reply 5.) Therefore, Carrillo contends that the drugs and gun found in the motel room, the guns found in his Chevy Tahoe, and all of the statements he made to the police must be suppressed as fruit of the poisonous tree. (Mot. to Suppress Evidence 7–8; Notice of Mot. 2.) The Government opposes on the grounds that the searches of the motel room and the Chevy Tahoe were valid parole searches because Carrillo was a California state parolee who agreed to warrantless searches of his residence and property as a condition of his parole. (*See* Government's Opp'n to Def. Lawrence Joseph Carrillo's Mot. to Suppress Evidence ("Government's Opp'n") 5–7; Government's Opp'n, Ex. B, Notice and Conditions of Parole.) Even if the search was not justified as a parole search, the Government argues that the officers needed to make a protective sweep of the motel room to ensure their safety and Rodriguez gave the officers consent to enter the motel room to check on her daughter's well-being, making their entry into the motel room lawful. (Government's Opp'n 8.) The Government contends that once the officers lawfully observed the contraband, they were entitled to seize it under the plain view doctrine. (Government's Opp'n 8.) Furthermore, the Government argues that Carrillo's explicit consent to search his Chevy Tahoe validates the search of the vehicle. (Government's Opp'n 1, 8–9.)

The Fourth Amendment protects against unreasonable searches and seizures. *See Minnesota v. Carter*, 525 U.S. 83, 88 (1988). Given the right to be free from unreasonable government intrusion in one's home, warrantless searches in the home are presumptively unreasonable. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Payton v. New York*, 445 U.S. 573, 586 (1980). Therefore, absent exigent circumstances, a warrantless search of a home violates the Fourth Amendment even if there is probable cause to search. *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal citations omitted)*.* Fourth Amendment protection is not limited to an individual's home. Rather, "[a] hotel room can clearly be the object of Fourth Amendment

protection as much as a home or an office." *Hoffa v. United States*, 385 U.S. 293, 300 (1966) (internal citation omitted); *see Lanza v. New York*, 370 U.S. 139, 143 (1962) ("A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house.'").

If a search or seizure violated the Fourth Amendment, the exclusionary rule requires exclusion of evidence obtained directly as a result of the violation, as well as evidence recovered as a result of the violation, or the "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). The determination of whether evidence obtained subsequent to an initial Fourth Amendment violation is the "fruit of the poisonous tree" turns on whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal citations omitted); *see Taylor v. Alabama*, 457 U.S. 687 (1982) (excluding as fruit of initial illegal arrest confession obtained after defendant was unlawfully arrested, taken to police station, advised of *Miranda* warnings, and visited by two acquaintances); *United States v. Howard*, 828 F.2d 552 (9th Cir. 1987) (finding that consent to search premises obtained from defendant's wife subsequent to initial unlawful entry of home was tainted and, thus, invalid, requiring exclusion of recovered evidence as fruit of the poisonous tree.)

Under the doctrine of standing to invoke the exclusionary rule, a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights. *United States v. Payner*, 447 U.S. 727, 731 (1980) (internal citations omitted). A defendant's own constitutional rights are violated only if "the challenged conduct invaded *his* legitimate expectation of privacy." *Id.* (internal citations omitted).

Here, because the police entered the motel room, which at the time served as Carrillo's residence, and searched Carrillo's Chevy Tahoe without a warrant, the entry and search violated Carrillo's Fourth Amendment rights unless a warrant exception applied. *See Groh*, 540 U.S. at 559; *Hoffa*, 385 U.S. at 300; *Lanza*, 370 U.S. at 143. Although the Government argues that the search of the motel room and the Chevy Tahoe were valid parole searches, the Court declines to address this issue because the police officers' actions were justified under alternative exceptions to the warrant requirement.

A.  Applicable Legal Standards

    1.  Protective Sweep

A protective sweep permits, pursuant to an arrest, a warrantless entry and search of a residence in order to protect the police and others present at the arrest scene. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is permissible where the police possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. In other words, a protective sweep is justified by "probable cause to believe that a serious and demonstrable potentiality for danger existed." *Id.* at 336. It is not necessary that the arrest occur within the residence for a protective sweep of the residence to be justified under the circumstances. *See United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989) (upholding protective sweep of interior of home where defendant was arrested immediately outside the door of the house.) As the Ninth Circuit explained:

> [i]f the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another.

*Id.* at 1397.

    2.  Consent

Valid consent is another recognized exception to the warrant requirement. *See Soldadl v. Cook County*, 506 U.S. 56, 66–67 (1992). Under the Fourth Amendment, the standard for measuring the scope of consent "is that of 'objective' reasonableness, . . . what would the typical reasonable person have understood by the exchange between the officer and the suspect . . . ." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991) (internal citations omitted). Valid consent may be obtained from an individual who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority rests on "mutual use of the property by persons having joint access or control for most purposes." *Id.* at 171 n.7.

### 3. Plain View Doctrine

Under the plain view doctrine, police officers can immediately seize a "suspicious object" when the police's access to the object has a prior justification under the Fourth Amendment. *See Texas v. Brown*, 460 U.S. 730, 738, 740 (1983) (internal citations omitted). If seizure of the evidence is appropriate under the plain view doctrine, then a subsequent search of the item is permissible. *See Arizona v. Hicks*, 460 U.S. 321, 326–28 (1986); *see also Brown*, 460 U.S. at 735. For the doctrine to apply, the police must be lawfully in the position from which they view the object, the police must have a lawful right of access to the object, and the "incriminating character" of the object must be "immediately apparent." *See Horton v. California*, 496 U.S. 128, 136–37 (1990). The "incriminating character" of the object is "immediately apparent" where the police have probable cause to believe that the object is contraband, i.e., probable cause to associate the object with criminal activity. *Minnesota v. Dickerson*, 508 U.S. 366, 375, 377 (1993) (internal citations omitted); *Brown*, 460 U.S. at 741. Probable cause to associate the object with criminal activity requires that the "facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband." *Brown*, 460 U.S. at 742, 743 (internal citations omitted) (holding that officer properly seized balloon, subsequently found to contain cocaine, pursuant to the plain view doctrine because officer had probable cause to believe balloon contained an illicit substance even though officer "could not see through opaque fabric of the balloon," as officer knew such balloons were frequently used to carry narcotics and surrounding circumstances suggested that defendant was engaged in drug-related activities.)

B. Analysis

1. Motel Room[4]

The police were permitted to make a warrantless entry of the motel room to perform a protective sweep pursuant to the lawful detention and arrest of Carrillo immediately outside the motel room door. *See Hoyos*, 892 F.2d 1387. Although the arrest occurred outside the motel room, the police's entry into the motel room was permissible under the circumstances because the police had "probable cause to believe that a serious and demonstrable potentiality for danger existed." *See Buie*, 494 U.S. at 336. Not only was the motel room door ajar, eliminating any protection from an attack launched from inside the room, but also the officers knew that the motel was notorious for drug trafficking and that Carrillo was a gang member, had observed several individuals approach the motel room and engage in what appeared to be hand-to-hand drug transactions, and Carrillo told the officers that he had a loaded gun in the room. Given that there was a loaded weapon and an unknown number of occupants in the room where police had observed what they believed to be a number of drug sales, the police had every reason to be concerned for their safety, as well as that of Carrillo, Rodriguez, and the now unaccompanied child in the room. Therefore, the police's warrantless entry into the room to perform a protective sweep did not violate Carrillo's Fourth Amendment rights.

The police's entry into the motel room was permissible on the alternative ground that Rodriguez had given the officers consent to check on the safety of her child. When Detective Mendez and Officer Vega approached Carrillo's girlfriend, Rodriguez, in the parking lot,

---

[4] Although not raised by either party, the entry into the motel room and any subsequent search of the room is not justified as a search incident to an arrest. The warrant exception for a search incident to an arrest is limited to searches within the suspect's "immediate control." *See Thorton v. United States*, 541 U.S. 615, 625 (2004) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)); *Chimel*, 395 U.S. at 763. The area in a suspect's immediate control includes "the area from which [the suspect] might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763. Here, because the officers, who remained outside the motel room during their initial interaction with Carrillo, did not handcuff Carrillo until he was outside the motel room, their subsequent entrance into the motel room and any search of the room was not permissible as a search incident to an arrest. (*See* Oviedo Decl. ¶ 2; Vega Decl. ¶ 8.) Once Carrillo was outside of the motel room, items in the motel room were not in his "immediate control."

she gave them permission to enter the motel room to check on her daughter's safety. (*See* Oct. 20, 2008 Tr. 59:15–60:1; 73:16–74:5; 89:7–15; Police Report 2; Mendez Decl. ¶ 6; Vega Decl. ¶ 6.) Because Rodriguez appeared to have common authority over the room, as officers knew that Rodriguez registered the room in her name and saw her exit from the room, her consent to enter the room was valid. *See Matlock*, 415 U.S. at 171.[5]

As the officers could lawfully enter the motel room based on the need for a protective sweep and Rodriguez's permission to check on the child, any object that the police saw and had probable cause to associate with criminal activity was properly seized under the plain view doctrine. *See Dickerson*, 508 U.S. at 375, 377; *Horton*. 496 U.S. at 136–37; *Brown*, 460 U.S. at 742, 743. From outside the motel room, whose door Rodriguez had left ajar, the officers could see a bag of what appeared to be marijuana sticking out of a black backpack on a chair next to the table in the corner of the room. (*See* Oct. 20, 2008 Tr. 67:24–68:1; 73:8–15; 76:13–77:2; Oct. 28, 2008 Tr. 8:18–9:7; Vega Decl. ¶ 7; Police Report 2–3.) Additionally, upon asking Carrillo whether he had any weapons or drugs, Carrillo, pointing toward the table, replied that he had a gun and drugs and then admitted that the gun in the backpack was loaded. (*See* Police Report 2; Mendez Decl. ¶ 7; Vega Decl. ¶¶ 7, 8.) Given the officers' knowledge that the motel was an active drug trafficking location, their prior observation of what appeared to be two hand-to-hand drug transactions with an occupant of the room, their awareness that Carrillo was on parole for drug sales, their observation of a bag of what appeared to be marijuana sticking out of the backpack, Carrillo's indication that he had drugs and a gun in the corner of the room where the backpack was located, and Carrillo's statements that the gun in the backpack was loaded, the police had probable cause to believe that the backpack contained contraband. *See Brown*, 460 U.S. at 742, 743. Despite the opaque nature of the backpack, the incriminating nature of its

---

[5] The Government correctly points out that Carrillo does not argue that Rodriguez's consent was involuntary but, rather, that she was not asked for and did not give consent. (*See* Government's Opp'n 9.) Nevertheless, based on the officers' declarations and testimony from the Motion to Suppress hearing, the Court is satisfied that Rodriguez's consent was voluntary. (Oct. 20, 2008 Tr. 73:20–74:5; 86:14–87:17; Oct. 28, 2008 Tr. 7:9–8:11; Mendez Decl. ¶ 6; Oviedo Decl. ¶ 4; Vega Decl. ¶ 6; *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973); *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002).

contents were "immediately apparent" under the governing standard. *See Dickerson*, 508 U.S. at 375, 377; *Brown*, 460 U.S. at 742, 743. Therefore, because the police could see the bag from their lawful location outside the motel room and had a lawful right to enter the room to conduct a protective sweep and check on the child pursuant to Rodriguez's consent, they were entitled to seize the backpack and subsequently search its contents under the plain view doctrine. *See Hicks*, 460 U.S. 326–28; *see also Brown*, 460 U.S. at 735.

Similarly, once the officers were lawfully in the motel room to conduct a protective sweep and pursuant to Rodriguez's consent to check on the child's safety, they could seize other pieces of incriminating evidence in plain view, including the bag of marijuana on top of the air conditioner and the nearly $2,000 in U.S. currency that was in the dresser drawer, which was open, and on top of the table. *See* Government Exs. 11–13; Oct. 20, 2008 Tr. 39:24–42:10; 42:15–43:10; 67:11–68:4; 72:20–73:8; Police Report 3, 5; *Horton*, 496 U.S. at 136–37. Upon seeing such an excessive sum of money and what appeared to be marijuana, the police, given the surrounding circumstances strongly suggesting that drug sales had taken place in the motel room, had probable cause to associate the items with criminal activity, specifically drug sales. Therefore, their seizure was permissible under the plain view doctrine.

        2.    <u>Carrillo's Vehicle</u>

Here, it is uncontested that Carrillo gave the officers explicit consent to search his Chevy Tahoe. (*See* Police Report 4; Mendez Decl. ¶ 8; Oviedo Decl. ¶ 8; Vega Decl. ¶ 9.) Carrillo is correct that if there had been a previous violation of his Fourth Amendment rights, this consent may well have been tainted by any such violation and, therefore, would be invalid, requiring the exclusion of any evidence acquired from the search as "fruit of the poisonous tree." *See Howard*, 828 F.2d 552; *see also* Def.'s Reply 7–8. Because there was no prior Fourth Amendment violation, however, the two firearms uncovered in the search of the Chevy Tahoe, as well as Carrillo's statements related to the search, are not excludable under the "fruit of the poisonous tree" doctrine.

Furthermore, Carrillo's argument that the consent to search the Chevy Tahoe was invalid because police sought consent only from him and not from Rodriguez, the co-owner of the vehicle,

is incorrect for two reasons. (*See* Def.'s Reply 5.)  First, the consent of an individual with "common authority" over the vehicle, such as Carrillo under whose name the vehicle is registered, is valid without the consent of other owners or users of the vehicle. *See Matlock*, 415 U.S. at 171. Furthermore, even if Rodriguez's Fourth Amendment rights were violated by the police's failure to seek her consent to search the vehicle, Carrillo lacks standing to seek exclusion of the evidence based on a violation of her constitutional rights.  For Carrillo to invoke the exclusionary rule, the search must have violated his constitutional rights. *See Payner*, 447 U.S. at 731.  Therefore, the police obtained valid consent to search Carrillo's vehicle and the guns located in the vehicle, as well as any of Carrillo's statements relating to their recovery, are admissible.

III.   RULING

     For the foregoing reasons, Defendant's Motion is DENIED.

     IT IS SO ORDERED.

October 30, 2008

/S/ S. James Otero

S. JAMES OTERO
UNITED STATES DISTRICT JUDGE